THOMAS WORTHINGTON, PLAINTIFF IN ERROR, V. THOMAS WOODS, DEFENDANT IN ERROR.

**Forcible Entry and Detention.** Where the testimony shows that a party is in possession of real estate under a contract of purchase, an action of forcible entry and detainer will not lie to oust him from such possession. *Dawson v. Dawson,* 17 Neb., 671. *C., B. & Q. R. R. v. Skupa,* 16 Id., 341. *Streeter v. Rolph,* 13 Id., 390. *Pettit v. Black,* 13 Id., 154.

ERROR to the district court for Lancaster county. Tried below before POUND, J.

*B. F. Johnson, A. W. Field,* and *L. C. Burr,* for plaintiff in error.

*R. D. Stearns* and *Jesse B. Strode,* for defendant in error.

MAXWELL, CH. J.

The defendant in error brought an action of forcible entry and detainer against the plaintiff in error to recover the possession of lot 7 in block 1 in Spencer's addition to Lincoln, and on the trial recovered a judgment of restitution. It appears from the testimony that one C. E. Worthington, a son of the plaintiff in error, entered into the following contract with one James E. Spencer:

"Know all men by these presents: That C. E. Worthington is held and firmly bound unto James E. Spencer in the penal sum of $1,200 dollars, for the payment of which I bind myself firmly by these presents, upon condition as follows: Whereas Jas. E. Spencer has agreed to sell and convey unto the said C. E. Worthington for the consideration of twelve hundred dollars, the following described premises, to-wit: Lot number seven (7) in block one (1) in Spencer's addition to Lincoln, according to the

recorded plat thereof, subject to a certain mortgage and notes of 200 dollars payable on or before 2 years from May 27th, 1886.    And C. E. Worthington has agreed to purchase said premises, and to make payment as follows: Thirty-two promissory notes of twenty-five dolllars each, and payable on the first of every month until all are paid, with the rate of interest of ten per cent per annum from date until paid.

"Therefore the condition of this obligation is such that if the above bounden Jas. E. Spencer will convey said premises by deed of general warranty, and clear of all incumbrances, unto said C. E. Worthington, upon payment of said considerations at the times above specified, then this obligation to be void; otherwise to remain in full force and effect.    Witness our signatures hereto subscribed this 31st day of May, A.D. 1886.

"JAS. E. SPENCER,

"C. E. WORTHINGTON.

"Witness:

"WILLIE MEYER.

"THE STATE OF NEBRASKA, }
    LANCASTER COUNTY.    } ss.

"Be it known that on the 31st day of May, 1886, before, the undersigned, Willie Meyer, a notary public in and for said county, personally came Jas. E. Spencer and C. E. Worthington, to me known to be the identical persons described in and executed the foregoing bond as obligors, and acknowledged the said instrument to be their voluntary act and deed.

"Witness my hand and notarial seal the day and year last above written.

"[SEAL.]    WILLIE MEYER,

" *Notary Public.*"

The plaintiff alleges that the above contract was made for his benefit, his son Charles making a payment thereon of $200.    The plaintiff testifies:    "We rented a home

on O street, opposite Mrs. Riordan.  Charles came in one day and says : Pa, you can save paying rent by buying that property on O street where Jim Spencer has just moved an old blacksmith shop.  I asked what he would sell it for.  He told me ; I said, how can we pay for it? He said, come out and see him.  We went out and saw him in his barn, and the thing was talked right over in the barn between me and Jim Spencer, and my boy.  Jim says, Charley, buy it for the old man and he can pay for it, and he can have a good home; he said, how much could you pay ?  And looked at my boy and kind of laughed. He said :  I can pay you $200 down.  He says : Well, I will take it, and $25 a month.  The house was in such a condition you could not keep a hog in it, even if it was fenced up.  There was no doors on the back part nor windows."

Q.    What about the $25?

A.    The $25 I was to pay monthly—that was to pay for the property till it was paid for on that contract; but there was a verbal contract between me and my son.  It was right before Spencer—Spencer was a witness to it— Spencer was the only witness to it.  I never said no one else.  He brought a little note into me; I took my specs out to look at it, and says:  " Mr. Spencer I won't pay that; I am not going to pay rent, and before I will pay I will go back to Iowa, where I hadn't no rent to pay."  He says: " Very well, Col.," and just scratched it off; I says, " All right."  He had taken the money and was counting it—I was taking the money back, but he took it up, and arranged it that way.  He never mentioned it to me, only what he said about Charley—never.

Q.    What was the condition of the house when you took possession?

A.    You could not keep a hog in it without it was fenced all around the house, nor without taking up the floor, which had tumbled all in ; nor hadn't no light—you

know what a blacksmith shop is. We had to take the upper floor off. There was such a stench of filth we had to take it out, and a person who came in there would know this himself. We patched it and put another floor on, and put it in two rooms. The house was in that condition you could not lead a horse in only in certain corners of the house, because it was getting all worn through where it had been a blacksmith shop, and not fit for no human being to live in.

Q. Who paid for fixing it up?

A. I paid all of it. Charlie paid for the lumber put into that; he told me to get the lumber there on 10th street—he was acquainted and I was not. He says: "Pa, go and get the lumber, and tell them to charge me." I took Henry with me, and we got it and hauled it up. He is a pretty good carpenter, and did that kitchen part. I paid for the labor and all the lumber of that eighteen or sixteen foot.

Q. Just the addition?

A. Just the whole building of the addition on the back room there—there is an addition put to it.

Q. Who paid for the lathing and plastering?

A. I paid all that inside work—all there is inside.

Q. Who built and paid for the ice house?

A. I built it and paid for it. I paid for that, I think, between the 23d of December—that is, all but what is still owing.

Q. When did you go into possession there?

A. I was in possession, I guess, on the first start, you see, when I moved into it. I moved in about the 1st of July.

Q. How did you come to pay $30 a month?

A. Thirty dollars a month, and $5 was to pay extra to keep the interest down. Twenty-five dollars was the agreement, and I defy either my boy Charles, or anybody else, to say it ain't so, because it is so, for it is facts, and

facts is stubborn. Jim Spencer says to me : "Worthington, don't blame me a particle, don't blame me."

Q. What did Spencer say at the time he scratched off that rent receipt?

A. He said : "All right Col.; all right Col.," and scratched it off as he spoke.

In this testimony the plaintiff is substantially corroborated by two of his sons.

The plaintiff made two payments of $30 each, the first being made about the first day of July, 1886, and the second in August, 1886, and received receipts therefor, both signed by Spencer. The words, for rent, which had been inserted by Spencer in the receipts, were stricken out, as the plaintiff insisted he was not paying *rent.* Some time in August, in the year 1886, Charles, the plaintiff's son, made some arrangements with Spencer by reason of which he surrendered the contract or bond heretofore set out, and seems to have done what he could to oust his father from the possession of the premises. The father, however, claimed to be the owner, and seems to have tendered the monthly payments upon the aforesaid contract. There is a large amount of testimony denying the title or interest of the plaintiff to the property in question. The plaintiff, however, retained possession, and claimed to be owner of the premises. In the autumn of 1886, Spencer sold the property in controversy to the defendant, Woods, who purchased with full notice of whatever title or interest the plaintiff may have in the premises. It will thus be seen that the action comes directly within the rule laid down in *C., B. & Q. R. R. v. Skupa,* 16 Neb., 341. *Streeter v. Rolph,* 13 Id., 399. *Pettit v. Black,* 13 Id., 154. *Dawson v. Dawson,* 17 Id., 671. In the latter case it is said : "Whether the contract under which the defendants hold possession is valid or not, cannot be determined by the county court or a justice of the peace, but is a proper question for a court of equity, which has power to protect

'the rights of the parties, and enforce its decrees, when an action is brought to enforce or annul the alleged contract."

This, in our view, is a correct statement of the law, and as it is evident that the plaintiff has an interest in the property in controversy, which can only be protected and enforced in a court of equity, an action of forcible entry and detainer will not lie.

The judgment of the district court is therefore reversed, and the action dismissed.

JUDGMENT ACCORDINGLY.

THE other judges concur.